

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

July 10, 2019

**BY ECF & EMAIL**
The Honorable Colleen McMahon
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: <u>United States v. Calvin Hudson</u>, 19 Cr. 496 (CM)

Dear Judge McMahon:

  The Government respectfully submits this letter in support of its motion for a review of Magistrate Judge Pitman's order granting defendant Calvin Hudson's ("Hudson" or the "defendant") bail application. Hudson has been indicted for his role in a large-scale crack cocaine distribution conspiracy, as well as his leadership of a loansharking and extortion conspiracy. In light of the nature and circumstances of the charged offenses, the strength of the evidence, Hudson's criminal history, and the specific danger Hudson poses to extortion victims and witnesses in this case, the Government respectfully submits that no bail conditions can reasonably be expected to ensure that he appears in court and does not endanger the community.

  Of the highest concern to the Government is the safety of victims and witnesses. As detailed below, given the nature of the charges, the evidence in this case (including a new witness who was interviewed by the FBI after yesterday's presentment), and the defendant's background, there is a real concern that this defendant's release will put multiple victims and witnesses in danger of physical harm. Accordingly, the Government respectfully requests that this Court order that the defendant be detained pending trial.

  **I.** **Procedural Background**

  On or about July 8, 2019, a grand jury sitting in this District returned a sealed indictment charging Hudson and his co-defendants, Jabron Green and Charles Kenyatta, in three counts. Count One charges Hudson and Green with participating in a conspiracy from at least in or about 2013 through in or about 2018 to distribute more than 280 grams of crack cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A). Count Two charges Hudson and Kenyatta with participating in a loansharking conspiracy, in violation of 18 U.S.C. § 892. Count Three charges Hudson and Kenyatta with participating in an extortion conspiracy, in violation of 18 U.S.C. § 1951.

All three defendants were arrested on July 9, 2019 and presented before Magistrate Judge Pitman.[1] At his presentment, Hudson made a bail application, which the Government opposed. Following a hearing, Judge Pitman granted Hudson's application and ordered that he be bailed under certain conditions. Specifically, Judge Pitman found that Hudson could be released on a $200,000 personal recognizance bond secured by $10,000 in cash and two cosigners, with the additional conditions of home confinement and electronic monitoring. On the evening of July 9, 2019, the Government sought to appeal Judge Pitman's decision, and the Court has scheduled a hearing for July 10, 2019.

## II.     Legal Standard

Under 18 U.S.C. § 3145(a)(1), the Government may seek review of a magistrate judge's order of release pending trial by the District Court with jurisdiction over the case. District Courts conduct this review *de novo*. *See United States* v. *Leon*, 766 F.2d 77, 80 (2d Cir. 1985); *United States* v. *Sierra*, No. 99 Cr. 962, 1999 WL 1206703, at *1 (S.D.N.Y. Dec. 16, 1999). The Court must order detention if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).

Congress has enacted a statutory presumption that a defendant charged with certain offenses should be detained while awaiting trial because "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community . . . ." 18 U.S.C. § 3142(e)(3). That presumption applies to the charge against Hudson. *See id.* § 3142(e)(3)(A) (applying presumption to "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 et seq.)"); 21 U.S.C. § 841(b)(1)(A) (imposing maximum sentence of life imprisonment). This presumption requires the defendant to produce evidence that he does not pose a danger to the community or a risk of flight. "Satisfying the burden of production does not," however, "eliminate the presumption favoring detention; it 'remains a factor to be considered among those weighed by the district court.'" *United States* v. *English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *United States* v. *Mercedes,* 254 F.3d 433, 436 (2d Cir.2001)).

In addition to the statutory presumption applicable in this case, courts considering a federal defendant's application for bail examine four factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, . . . or involves . . . a controlled substance . . .;  (2) the weight of the evidence against the person;  (3) the history and characteristics of the person, including-- (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug

---

[1] Following a bail argument, Judge Pitman ordered that Kenyatta be detained. Green consented to detention while preserving his right to make a bail application at a later date.

>        or alcohol abuse, criminal history, and record concerning
>        appearance at court proceedings; and (B) whether, at the time of
>        the current offense or arrest, the person was on probation, on
>        parole, or on other release pending trial, sentencing, appeal, or
>        completion of sentence for an offense under Federal, State, or local
>        law; and (4) the nature and seriousness of the danger to any person
>        or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

### III. Discussion

As discussed below, the four factors, taken together, demonstrate that Hudson is both a danger to the community and a flight risk and should accordingly be detained pending trial. In order to provide a fuller context, the Government first addresses the nature of the charges, the strength of the evidence, and the defendant's background before addressing the specific danger this defendant poses to victims and witnesses. To be clear, though, the Government views that final factor to be the most significant factor weighing in favor of detention.

#### A. Nature and Circumstances of the Offenses

Count One of the Indictment charges Hudson with participating in a conspiracy to distribute wholesale quantities of crack cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A). The nature and circumstances of this offense favor detention on multiple levels. As a matter of statutory law, this offense triggers the statutory presumption in favor of detention under § 3142(e)(3), and controlled substance offenses are also singled out by § 3142(g)(1). As a matter of precedent, the Second Circuit has held that narcotics trafficking presents a danger to the community and should be treated as such for purposes of bail determinations. *See Leon*, 766 F.2d at 81 (2d Cir. 1985). Further, as a matter of common sense, the severe penalties Hudson faces, which includes the ten-year mandatory minimum and potential life sentence accompanying any charge involving § 841(b)(1)(A), give him a strong incentive to flee.

Counts Two and Three of the Indictment charge Hudson with participating in a loansharking conspiracy, in violation of Title 18, United States Code, Section 892, and in an extortion conspiracy, in violation of Title 18, United States Code, Section 1951. These two charges arise out of the same course of conduct in which the defendant extended large cash loans and then threatened to kill the borrowers if they failed to pay what Hudson claimed they owed by the time Hudson demanded his payment. These charges each carry a maximum penalty of 20 years' imprisonment, thereby enhancing the incentive to flee. More importantly, and as discussed further below, these charges also reflect conduct that poses a specific risk of harm to Hudson's victims.

### B. Weight of the Evidence

The evidence against Hudson is overwhelming. The narcotics conspiracy evidence includes the anticipated testimony of at least two cooperating witnesses, both of whom personally witnessed Hudson with kilogram quantities of narcotics between approximately 2013 and 2018. For example, one of those cooperating witnesses ("CW-1") personally observed Hudson and another co-conspirator cooking up to a kilogram of cocaine into crack cocaine on multiple occasions. In addition, CW-1 completed four controlled purchases of crack cocaine from Hudson at the direction of the FBI in 2018. In total, CW-1 received 150 grams of crack during these controlled purchases. First, on or about February 27, 2018, CW-1 made a recorded purchase in which Hudson provided CW-1 with 40 grams of crack cocaine and 40 grams of powder cocaine. These drugs were provided on consignment with the understanding that CW-1 would pay Hudson after selling the crack and cocaine. On or about March 4, 2018, CW-1 paid Hudson for the drugs from the first purchase. Second, on or about March 10, 2018, Hudson provided CW-1 with 40 grams of crack. Hudson approached CW-1 unexpectedly with the crack, and as a result the transaction was not recorded. CW-1 felt that he could not refuse the delivery without raising Hudson's suspicions, so he accepted the crack and turned it over to the FBI at his next meeting with the agents. In a recorded meeting on March 13, 2018, CW-1 paid Hudson for the crack that Hudson had delivered on March 10. Third, on or about March 26, 2018, CW-1 asked to purchase crack from Hudson. In response, during a recorded conversation, Hudson directed CW-1 to purchase the crack from his co-defendant Jabron Green. That same day, CW-1 completed a recorded purchase of 40 grams of crack from Green. Fourth, on or about April 26, 2018, Hudson sold 30 grams of crack to CW-1 during a recorded controlled purchase. Given these recordings, the amount of crack that CW-1 purchased, and the anticipated testimony from both CW-1 and a second cooperator confirming that Hudson was a wholesale drug dealer, there is exceptionally strong evidence that the defendant participated in a conspiracy to distribute more than 280 grams of crack cocaine.

Similarly, the evidence of Hudson's participation in an extortion and loansharking conspiracy is very strong. In particular, the Government expects CW-1 to testify that he personally witnessed at least one phone call during which Hudson spoke with an individual who owed Hudson money ("Victim-1"). CW-1 further recalls that Hudson stated that Victim-1 was "playing games" and as a result he did not need to worry about the money anymore. CW-1 understood this to mean that Hudson planned to kill Vicitm-1.

Consistent with CW-1's recollection, Victim-1 is expected to testify that between 2017 and late 2018, Victim-1 obtained loans from Hudson and his co-defendant Charles Kenyatta with extremely high interest. When making those loans, Kenyatta would deliver the cash on behalf of Hudson. Victim-1 would then be required to repay the principal plus 50% interest. For example, when Victim-1 borrowed $100,000, he had to repay the original $100,000 plus $50,000 interest, for a total of $150,000. Between 2017 and 2018, Victim-1 received multiple loans between $50,000 and $100,000 each time. At first, Victim-1 only interacted with Kenyatta, who provided the loans in cash and then collected payment from Victim-1. Initially, Victim-1 was always able to repay the loans on the schedule set by Kenyatta, but at one point, Victim-1 was late in making one of his payments. In response, Kenyatta threatened to kill Vicitm-1 and informed Vicitm-1 that

the money came from Kenyatta's boss. After Victim-1 still could not come up with the money, Kenyatta summoned Victim-1 to a meeting, where Kenyatta introduced Vicitm-1 to Hudson. Tellingly, Kenyatta referred to Hudson as his "boss." Hudson then indicated that Victim-1 owed Hudson an additional $1,000 fee for every day Victim-1 was late in making payments. Victim-1 eventually repaid the loan plus the late fee.

In the fall of 2018, Vicitm-1 took a final loan from Hudson and Kenyatta for $50,000, again at 50% interest. Victim-1 was late in paying what he owed, and in response, Kenyatta again summoned Vicitm-1 to a meeting. At that meeting, Kenyatta physically assaulted Victim-1 by dragging Victim-1 out of a car. Hudson then took Vicitm-1 aside and told Victim-1 that he would kill Vicitm-1 if Victim-1 did not pay Hudson the money by the end of the week. Hudson further told Victim-1 that Hudson knows where Victim-1 lives and that Kenyatta was carrying a gun. Following that conversation, Victim-1 was only able to make a partial payment of what he owed. As a result, to this day, Victim-1 has not repaid everything that Hudson and Kenyatta claim Victim-1 owes. In response to this failure to pay, among other things, Hudson directed CW-1 to complete a three-way call to Victim-1 during which Hudson made statements that Victim-1 understood to be threatening Vicitm-1's life.

The account of Victim-1 has been consistent across multiple interviews and is corroborated by other witnesses (including CW-1), recordings, and phone records. Of particular note, Victim-1's phone contained a number of text messages from Kenyatta repeatedly demanding payments from Vicitm-1. Several of those text messages refer to Kenyatta's "boss," and at one point Victim-1 responded to Kenyatta by asking to "set up the meeting with Calvin," referring to Hudson. In addition, on multiple occasions in 2019, Victim-1 engaged in recorded conversations with Kenyatta and separately with Hudson. Both of those include conversations in which Hudson and Kenyatta confirm that Vicitm-1 still owed money.

Because of the sophisticated and seemingly practiced nature of Hudson's extortion of Victim-1, the Government believed there may be additional victims of the same scheme. As a result, the Government's investigation of Hudson's loansharking and extortion activity has continued beyond his arrest. In fact, after the presentment yesterday, the FBI located and interviewed a second victim of Hudson's extortion scheme ("Victim-2").[2] According to Victim-2, in or around 2018, Victim-2 sought a loan from Hudson for Victim-2's business (the "Business"). In response, Hudson agreed to provide capital to Victim-2 in exchange for an equal partnership in the Business. Under this arrangement, whenever the Business received payments from clients, one third of the payment would go to Hudson, one third to Victim-2, and one third back into the Business's account.

In late 2018, one of the Business's clients was late in making a payment it owed to the Business. In response, Hudson insisted that regardless of whether the client paid or not, Victim-2 would have to pay Hudson his share of the expected profits by the due date. When Victim-2 indicated that he did not believe he needed to pay Hudson anything until the Business's client

---

[2] The Special Agent who interviewed Victim-2 will be present at this afternoon's hearing.

made its payment, Hudson threatened to "put two bullets in" Victim-2's head if Victim-2 did not pay what Hudson demanded. Vicitm-2 credited this threat because Victim-2 personally observed Hudson carrying a handgun in his waistband on multiple occasions. Hudson also told Victim-2 that he (Hudson) had previously served a long prison sentence for murdering someone in the Bronx.

Although Vicitm-2 was fearful for his life following this incident, Victim-2 also felt unable to sever ties with Hudson for fear of reprisal. About a month later, another client was also late in making a payment it owed to the Business. Again, Hudson insisted that Victim-2 pay Hudson his share of the expected profits by the due date regardless of whether the client had made payment. During this incident, Hudson again threatened to "put two bullets in" Victim-2's head if Hudson did not receive his money. Following this second threat, Victim-2 decided that Victim-2 had to sever ties with Hudson regardless of the risk.

In early 2019, Victim-2 abandoned the Business and moved to a new residence in an attempt to sever all ties with Hudson. In or about April 2019, Hudson contacted Victim-2 by phone and stated that the next time Hudson sees Victim-2, it will be the last time Vicitm-2 sees anyone. Victim-2 viewed that conversation as a threat to kill Victim-2. Perhaps most concerning, when Victim-2 and Hudson were working together, Hudson told Victim-2 that if Hudson was ever arrested and made bail, Hudson would "get" whatever person cooperated with the authorities.

In short, given the strength of the evidence demonstrating that Hudson engaged in a panoply of serious and dangerous criminal activity, as well as the severe penalties he faces if convicted, this statutory factor also supports detention.

### C. The History and Characteristics of the Defendant

Hudson's history and characteristics further favor detention. As discussed above, Hudson is an organizer of a serious narcotics trafficking conspiracy and a violent loansharking and extortion conspiracy, history and circumstances that plainly favor detention. Moreover, the defendant has a lengthy criminal history and was on parole for the first three years of the narcotics conspiracy charged in Count One. In 1989, Hudson was convicted of felony criminal possession of a weapon, and was sentenced to five years of probation. While still on probation, Hudson was arrested in 1991 for new felony charges and remanded. Following a jury trial in that case, in 1993 Hudson was convicted of criminal possession of a controlled substance, attempted robbery, burglary, and conspiracy. For those charges, the defendant was sentenced to a term of 23 years to life imprisonment. After spending approximately 17 total years incarcerated, the defendant was released on parole in 2008. He was discharged from parole in 2016, meaning that the defendant participated in the narcotics conspiracy charged in Count One while on parole following a lengthy prison sentence. If multiple felony convictions, court supervision under probation and parole, and more than a decade in prison were not enough to deter the defendant from engaging in repeated and wide-ranging crimes, there is little reason to believe that pretrial conditions will do any better.

To be sure, Hudson has family ties to the community, yet those ties did not prevent him from becoming involved in distributing wholesale quantities of crack cocaine, loansharking, or extortion. Indeed, those same ties were presumably present when the defendant was convicted of felony charges in the past. The combination of those ties and his prior convictions and sentences did nothing to deter the defendant from engaging in the exact same activity again, and there is no reason to believe they would stop him now.

### D. The Nature and Seriousness of the Danger

The single most important factor in the Government's decision to appeal Judge Pitman's decision is the danger this defendant poses to specific individuals if released. As described above, Hudson has specifically threatened to kill two different victims. Indeed, he apparently predicted this very scenario when he told Vicitm-2 that if he was ever arrested, he would make bail and then "get" the person who cooperated against him. Both victims are understandably terrified that if Hudson is released, he will harm them and their loved ones. Although the Government has attempted to protect the identities of its witnesses, the discovery in this case features recordings of the defendants' interactions with CW-1 and Victim-1, on which their voices are audible. It is therefore extremely likely that the defendant will identify at least CW-1 and Victim-1 and would pose a danger to them and their loved ones should the defendant be released.

More generally, the danger Hudson represents to the community at large is plain. He is a prolific narcotics trafficker, who is willing to engage in extortionate threats. *See Leon*, 766 F.2d at 81. Multiple prior felony convictions and multi-year prison sentence offered no apparent deterrence, and the defendant's pattern of conduct raises serious concerns that should he be released he would continue to engage in crimes thereby endangering the community.

The bail conditions imposed by Judge Pitman do not mitigate this risk. The imposition of a secured bond and electronic monitoring at best address only risk of flight and do not impose sufficient constraints to overcome the presumption of danger. Indeed, the Second Circuit has previously found comparable bail packages inadequate to overcome the preliminary presumption in favor of detention. *See United States* v. *Mercedes*, 254 F.3d 433, 436-437 (2d Cir. 2001). Here, the proposed collateral would be counterbalanced by the funds Hudson presumably accessed selling large amounts of crack and making extortionate loans in which he received tens of thousands of dollars in cash as interest. It is therefore likely that Hudson has access to substantial funds, which he could use to evade prosecution should he be released.

Nor does electronic monitoring provide significant assurances. The Second Circuit has previously recognized the shortcomings of electronic monitoring. *See, e.g.*, *United States* v. *Orena,* 986 F.2d 628, 632 (2d Cir. 1993). Those same shortcomings raise concerns here. Restricting Hudson to his home would not prevent him from coordinating with other coconspirators at all. As discussed above, Hudson operated his conspiracies by enlisting the assistance of others, such as Kenyatta and Green, including to as muscle to intimidate a victim of his loansharking and extortion scheme. Home confinement would do nothing to prevent Hudson from coordinating with other individuals to track down, intimidate, and even physically harm the

victims and witnesses in this case. By contrast, the physical restraints, monitored visits, and automatically recorded phone calls from prison are far better equipped to ensure that the defendant cannot harm witnesses or continue his participation in criminal activity without detection.

Moreover, should Hudson decide to personally confront a victim or witness, electronic monitoring would do absolutely nothing to stop him. The system is monitored only remotely, by Pretrial Services staff whose only immediate means of responding to violations is calling the defendant on the phone. In other words, there would be nothing to stop the defendant from leaving his home and personally confronting or harming a witness. At best, even assuming the defendant keeps wearing his monitoring device when leaving his home, that device will only tell Pretrial where the defendant was when he attacked or killed a victim. It simply cannot prevent an attack.

For similar reasons, electronic monitoring offers little comfort that the defendant will not flee. The mere possibility that Hudson's flight would be reported well after he spent hours refusing to answer the calls of pretrial services staff would do little to help locate him once gone. *See Orena*, 986 F.2d at 633 (noting the limited value of home detention absent "extensive monitoring of homes, telephones, and travel").

### E. Conclusion

For the foregoing reasons, the defendant has not rebutted the statutory presumption that he should be detained pending trial, particularly to ensure the safety of victims and witnesses in this case.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Timothy Capozzi
Maurene Comey
Aline Flodr
Assistant United States Attorney
(212) 637-2324

cc: All counsel of record (via ECF)