USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/4/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

UNITED STATES OF AMERICA,

    -against-

CALVIN HUDSON,

              Defendant.

---------------------------------------------------------x

19 CR 496-01 (CM)

## DECISION AND ORDER ON DEFENDANT'S MOTION TO SEVER CERTAIN COUNTS AND GOVERNMENT'S MOTIONS *IN LIMINE*

McMahon, C.J.:

    Calvin Hudson stands charged in an eleven-count indictment with various crimes: six relate to an alleged drug-dealing conspiracy, and five relate to an alleged loan-sharking scheme. Hudson has filed a motion asking the Court to sever the trial of the drug counts from the trial of the extortion counts. He claims that the drug and extortion counts deal with entirely distinct courses of conduct, and that trying them together would work a substantial prejudice against him, and violate his right to a fair trial. The Government opposes the motion, arguing that the offenses are properly joined because they have a sufficient logical connection to each other, and because the Government's evidence on the drug counts and the extortion counts overlap.

    The parties have also filed motions *in limine* asking the Court to issue pretrial rulings on various evidentiary matters.

### Background

    According to the Government, it intends to establish at trial—through witness testimony, wiretap recordings, audio and video recordings, phone records, text communications, physical evidence, and documents—that Hudson was a narcotics supplier in the East Harlem

1

neighborhood of Manhattan, who also provided extortionate loans and used threats of violence to extract payments from multiple victims. The Government's theory at trial will be that Hudson had ready access to large amounts of cash to lend at extortionate rates because of his thriving drug business, which involved the sale of large quantities of cocaine, crack cocaine, and heroin. As a result, on multiple occasions, Hudson easily provided tens of thousands of dollars in cash to both Victim-1 and Victim-2. The Government says that some of the evidence proving Counts One through Six (the "Drug Counts") and the evidence proving Counts Seven through Eleven (the "Extortion Counts") will come from the same witnesses. Government Memo at 2.

Hudson's Severance Motion

Hudson claims that "unless the Superseding Indictment is bifurcated as requested, Mr. Hudson would be prejudiced in numerous ways." *Id.* at 2. Hudson claims he would very much like to testify in his own defense on the extortion counts, but would not be able to at a joint trial without having to offer self-incriminating testimony on the drug counts—as to which he intends to stand on the presumption of innocence and not testify. *Id.* Hudson claims that this "improper joinder" of counts would force him to waive his constitutional right to testify on the extortion counts. *Id.* Hudson also claims that evidence that he allegedly carried a firearm during the drug conspiracy would negatively infect the jury's consideration of whether he made threats of violence—some of which are alleged to have involved guns—in the extortion/loan-sharking half of the case. And he claims that "There is a substantial risk that a jury, confronted with this cobbled-together set of disparate allegations, would conclude based on the sheer number of different offenses charged that Mr. Hudson was likely guilty of some or all of the counts, and thus convict him without properly giving individualized attention to whether the Government has met its evidentiary burden as to any or all of the eleven counts when analyzed separately." *Id.*

2

Hudson argues that the principal "inference" the Government is relying on to link the disparate charges—that defendant used the money from his illegal narcotics business to engage in the loan sharking scheme—"is as fatally prejudicial as it is offensive and unsupported." Defendant's Reply at 2-3. Indignant that the Government would suggest that the only way he could possess large sums of money is from drug dealing, Hudson insists that "he built a legitimate, profitable construction business in his community, and that he operated aspects of it frequently in cash." *Id.* Obviously, Hudson would not want the jury to infer that he had no source of income other than dealing in drugs, and since the Government admits that it cannot actually trace the money used for the "loans" to any particular drug deal or even to the drug business generally, the importance of getting information about Hudson's other business activities before the jury is patent.

But defendant also argues that the alleged linkage between funds reaped from the alleged drug conduct and funds used for his alleged extortion is irrelevant. He cites *United States v. Castellano*, 416 F. Supp. 125 (E.D.N.Y. 1975) for the proposition that "neither Section 892 nor Section 1955 is concerned with the source of the money used for the purpose of either [illegal] gambling or loan sharking[.]" *Castellano*, 416 F. Supp. at 130–31. Since the source of money tending to prove used to extend credit to Victims 1 and 2 is not an element of the offense, Hudson argues that evidence tending to prove such matters is irrelevant and inadmissible, and so cannot provide the nexus for joining otherwise "unrelated" charges.

At bottom, Hudson asks the Court to sever because "his right to a fair trial would be confounded by these eleven counts being tried together, as he would be unable to testify as to the non-drug counts, while remaining silent as to the drug counts."

At a conference held in court on September 23, 2021, the court permitted defendant to

3

make an *ex parte* and *in camera* proffer of what his testimony would be at a separate trial on the loan sharking counts, and why he would be precluded from telling that story at a joint trial. I am divulging nothing from that *ex parte* proceeding by saying Hudson believes he has an innocent explanation that would exonerate him on the extortion charges, but that same explanation would hurt his case against the drug charges, if he were subject to cross examination on those drug charges.

*The Law Regarding Joinder and requested Severance*

Federal Rule of Criminal Procedure 8(a) provides that two or more offenses against a single defendant may be joined in a single indictment

> if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a); *see United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988)). "Each of these tests for when offenses may be tried together reflects a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused." *Id.* (citing *United States v. Werner*, 620 F.2d 922, 929 (2d Cir. 1980)). "The propriety of joinder under Rule 8(a) is a question of law." *United States v. Ajlouny*, 629 F.2d 830, 842 (2d Cir. 1980).

Rule 8(a) does not require "too precise an identity between the character of the offenses." *Werner*, 620 F.2d at 926. Indeed, for purposes of Rule 8(a), "'[s]imilar' charges include those that are 'somewhat alike,' or those 'having a general likeness' to each other." *United States v. Rivera*, 546 F.3d 245, 253 (2d Cir. 2008) (quoting *Werner*, 620 F.2d at 926). ). Under this "liberal standard for joinder," *United States v. McGrath*, 558 F.2d 1102, 1106 (2d Cir. 1977), multiple distinct counts "warrant joinder in a single trial" when they have "sufficient logical connection" to one another, *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990), where "the same

evidence may be used to prove each count," *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991), or where the evidence proving the counts is "interconnected and overlapping," *United States v. Amato*, 15 F.3d 230, 236 (2d Cir. 1994). "For purposes of analysis under Rule 8(a)," however, "no one characteristic is always sufficient to establish similarity of offenses, and each case depends largely on its own facts." *Blakney*, 941 F.2d at 116 (internal quotations and citations omitted).

Federal Rule of Criminal Procedure 14 provides that, even where joinder is otherwise proper under Rule 8, the Court may grant a severance "[i]f the joinder of offenses . . . in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government . . . ." Fed. R. Crim. P. 14. In order to succeed on a severance motion under Rule 14, however, "'the defendant must show not simply some prejudice but *substantial* prejudice.'" *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (quoting *Werner*, 620 F.2d at 928) (emphasis in original). Under this standard, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro v. United States*, 506 U.S. 534, 540 (1993). This high threshold for severance reflects the "well-recognized" principle "that joint trials serve the public interest in economy, convenience, and the prompt trial of the accused." *Turoff*, 853 F.2d at 1039. In fact, "[i]t would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying . . . ." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987). Consistent with this understanding, the Second Circuit has stated that "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial" of a motion on prejudice grounds. *United States v. Rosa*, 11 F.3d 315, 341 (2d

Cir. 1993).

A defendant seeking severance shoulders a "heavy burden of showing that joinder will result in 'substantial prejudice.'" *Amato*, 15 F.3d at 237 (quoting *Turoff*, 853 F.2d at 1043). Even in those rare instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citing *Richardson*, 481 U.S. at 211); *see United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) (same). The Second Circuit has recognized that any prejudice of joinder "is largely absent in situations where evidence of separate crimes would be admissible anyway." *United States v. Halper*, 590 F.2d 422, 431 (2d Cir. 1978). Indeed, "[u]nfair prejudice does not result if evidence admissible to prove each charge is also admissible to prove the other charge." *United States v. Peoples*, 748 F.2d 934, 936 (2d Cir. 1984).

When a defendant claims that joinder is prejudicial because he wishes to testify on some but not all of the counts in an indictment, the defendant must "make[] a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *Sampson*, 385 F.3d at 191 (quoting *Werner*, 620 F.2d at 930). To establish that this type of prejudice warrants severance, "[i]t is settled that a mere unexplicated assertion of this sort is not enough." *Werner*, 620 F.2d at 930. Rather, "a particularized showing must be made concerning the testimony the defendant wishes to give and his reasons for remaining silent on the joined counts," which allows the Court to "make an independent evaluation of whether the defendant will be prejudiced to an extent that outweighs the interest favoring joinder." *Id.* (quoting *United States v. Jamar*, 561 F.2d 1103, 1108 n.9 (4th Cir. 1977)). "In making such a showing, it is essential that the defendant present enough information— regarding the nature of the testimony he wishes to give on one count and his reasons for not

6

wishing to testify on the other— to satisfy the court that the claim of prejudice is genuine," and to allow the court to then weigh that prejudice against the efficiencies of joinder. *Sampson*, 385 F.3d at 191 (quoting *Baker v. United States*, 401 F.2d 958, 977 (D.C. Cir. 1968)). Consistent with this instruction, District Courts within this Circuit have denied severance where a defendant provides an insufficiently detailed explanation of the testimony he intends to offer regarding certain counts. *See, e.g., United States Krug*, 198 F. Supp. 3d 235 (W.D.N.Y. 2016) (denying severance motion where "the defendant explains 'his reasons for not wishing to testify on' some counts," but "does not, as he must, provide information 'regarding the nature of the testimony' he intends to provide" (quoting *Sampson*, 385 F.3d at 191)); *United States v. Ezeobi*, 10 Cr. 669 (DLC), 2011 WL 3625662, at *4 (S.D.N.Y. Aug. 17, 2011) (denying severance motion where defendant "does not explain in any detail what testimony he would give if he took the stand").

*All Counts in the Indictment are Properly Joined Under Rule 8*

The counts contained in the Indictment satisfy the joiner requirements of Rule 8(a). There is "sufficient logical connection" between the Drug Counts and the Extortion Counts to support their joinder, because the Government intends to argue that Hudson used proceeds from his illegal narcotics business to make the extortionate loans made to Victim-1 and Victim-2, and that the guns Hudson carried on his person to protect himself in connection with his drug business, were the guns that instilled fear in his extortion victims. *See Ruiz*, 894 F.2d at 505 (multiple distinct counts "warrant joinder in a single trial" when they have "sufficient logical connection" to one another). The Government's theory of the case is sufficient to link the two sets of charges.

Hudson's legal argument that evidence about the "source of the funds" used to extend extortionate credit is irrelevant, inadmissible at trial, and therefore not a proper basis for joinder

7

is simply wrong. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed.R.Evid. § 401. One of the elements of the crime "extortionate extension of credit" that the Government must prove beyond a reasonable doubt—and therefore "an issue of consequence in determining the action"—is that the defendant extended credit to the victim.[1] That Hudson had access to large amounts of cash—whether from his lawful business, as he contends, or from his illegal narcotics distribution business, as the Government argues—tends to make it more probable that he made the loans. Absence proof that Hudson had the ability to make the alleged extortionate loans, the jury might reject the Government's allegations out of hand, without even considering the Government's evidence about defendant's extortionate conduct. So, while the source of funds used for the loans is not an element of the offense that the Government must prove beyond a reasonable doubt, proving that Hudson had the ability to make large cash loans as a result of his drug dealing is neither irrelevant or immaterial to the Government's case in chief.

*Severance Not Warranted Under Rule 14*

Because the counts are capable of being joined under Rule 8, the counts will not be severed pursuant to Rule 14 unless Hudson meets his "heavy burden of showing that joinder will result in 'substantial prejudice.'" *Amato*, 15 F.3d at 237 (quoting *Turoff*, 853 F.2d at 1043). Hudson claims he would suffer substantial prejudice if the drug counts are tried together with the extortion counts, since he will effectively be deprived of his Fifth Amendment right to testify in his defense on the extortion counts.

---

[1] Title 18, United States Code, Section 892 makes it a crime to make any extortionate extension of credit. "For you to find the defendant guilty, the government must prove each of the following beyond a reasonable doubt: First, that the defendant made, or conspired to make, an extortionate extension of credit; and Second, that the defendant did so knowingly. Pattern Jury Instructions for Federal Criminal Cases.

8

The court has considered at length counsel's proffer under seal about the testimony that Mr. Hudson would give concerning his legitimate business activities and his dealings with alleged extortion Victims 1 and 2. I concede that the information that Mr. Hudson wishes to convey to the jury, if believed by the trier of fact, would tend to negate the Government's theory that Hudson's drug dealing was the source of funding for the money that he admittedly provided (albeit under sharply disputed circumstances) to Victims 1 and 2. This might well affect the verdict on the extortion charges.

However, in its Sur Reply (requested by the Court after it allowed defendant to make his *ex parte* proffer), the Government has set forth its most thorough proffer of its proposed evidence. According to the Government, it would hope to have CW-1, Victim-1, and Victim-2 testify at a trial on the extortion counts, that:

> CW-1 has known Hudson for almost all of CW-1's life. CW-1 began selling narcotics for Hudson in approximately 1986 or 1987. During this period, Hudson bought multiple kilograms of powder cocaine at a time, which was then cooked into crack cocaine. CW-1 bagged crack cocaine for Hudson at an apartment in the vicinity of 105th or 106th Street in Manhattan, and sold dime bags of that crack cocaine for Hudson. CW-1 is expected to further testify that during the 1990s and 2000s, Hudson and CW-1 were arrested and convicted on unrelated charges, spent time in prison, and lost touch. After CW-1 was released from prison, around 2012, CW-1 contacted Hudson and asked Hudson for work. From then until approximately February 2018, CW-1 assisted Hudson with Hudson's narcotics business, picking up, delivering, and selling narcotics, and picking up and delivering large quantities of cash. In some instances, as CW-1 is expected to testify, Hudson personally cooked or directed others to cook some of Hudson's cocaine into crack cocaine. The testimony from CW-1 will further establish that Hudson protected his drug business with guns, carrying guns on his person and supplying at least one gun to CW-1, who at the time was one of Hudson's subordinate drug dealers.
>
> The Government expects CW-1 to further explain that due to CW-1's longstanding relationship with Hudson, primarily as someone who worked for Hudson's drug trafficking business, Hudson not only felt comfortable engaging in drug dealing with CW-1, but also in trusting CW-1 with information about his other criminal activities and involving CW-1 in those

9

> activities, including Hudson's loansharking and extortion scheme of Victim-1.
>
> Victim-1 is expected to testify that during 2017 and 2018, Hudson loaned a total of approximately $400,000 in cash to Victim-1, a subcontractor, who needed the funds to pay Victim-1's employees. In return, Hudson demanded huge interest payments (*e.g.*, $50,000 interest on a $100,000 loan) and additional substantial late fees (*e.g.*, $1,000 per day). When Victim-1 fell behind on Victim-1's payments, Hudson and his co-conspirator, Charles Kenyatta—during phone calls, via text messages, and at in person meetings—physically assaulted and threatened to kill or harm Victim-1 if Victim-1 did not make the payments they demanded. Victim-1 is expected to testify that at some point Victim-1 also met CW-1, who would occasionally pass messages regarding the loans between Victim-1 and Hudson. Additionally, at least one of Victim-1's conversations with Hudson regarding the loans took place during a three-way call involving Hudson, Victim-1, and CW-1. Ultimately, out of fear for Victim-1 and Victim-1's family, Victim-1 cashed multiple fake checks in order to give Hudson the cash he demanded.
>
> Corroborating Victim-1's account, CW-1 is expected to testify that Hudson told CW-1 that Hudson had loaned a large amount of money to Victim-1 and charged Victim-1 a high interest rate. Hudson also told CW-1 that Victim-1 owed Hudson money from those loans. CW-1 is further expected to testify that at some point CW-1 set up a three-way call among CW-1, Hudson, and Victim-1, during which CW-1 heard Hudson discuss the money he had given to Victim-1 and threaten Victim-1. A few days following that call, Hudson told CW-1 that Victim-1 had borrowed more money and again owed Hudson money. Hudson's preexisting relationship with CW-1, involving years of illegal activity, crucially explains why Hudson would involve CW-1 in his extortion scheme and why Hudson would trust CW-1 to assist in an illegal scheme. Indeed, during the same time that Hudson apprised CW-1 of Hudson's extortion of Victim-1, Hudson was actively involved in selling drugs to CW-1, who was by then acting at the direction of law enforcement.[2]

Government Sur Reply at 2-4.

With regard to Victim-2, the Government says that Victim-2 would testify that:

> In 2018, Hudson gave Victim-2 tens of thousands of dollars in cash when Victim-2 was unable to make payroll. Victim-2 eventually repaid Hudson, with interest. In 2019, Hudson told Victim-2 that Hudson would pay Victim-2's vendor approximately $70,000, which Victim-2 owed. Victim-

---

[2] Unbeknownst to Hudson and Victim-1, at the time CW-1 was passing messages to Victim-1 from Hudson and during the three-way call, CW-1 was working with and at the direction of law enforcement.

10

2 thereafter paid Hudson approximately $40,000 to reimburse Hudson before learning that Hudson did not in fact pay the vendor and had no intention of paying the vendor. When Victim-2 confronted Hudson, Hudson demanded the remaining $30,000, threatening that he would kidnap and torture Victim-2 unless Victim-2 paid. Victim-2, who would testify that Victim- 2 had previously seen Hudson in possession of two different handguns, that Victim-2 had been told by Hudson that Hudson would "put two bullets" in Victim-2's head on prior occasions when the two disagreed, that Victim-2 had been told by Hudson that Hudson had spent 18 years in jail for murder, and that Victim-2 had witnessed Hudson lose his temper and threaten to harm others, paid Hudson the money.

The Government further expects that Victim-2 would testify on direct concerning two discrete incidents that are relevant both to the drug case and the extortion case. First, in approximately November 2018, Hudson permitted Victim-2 to reside temporarily in an apartment that Hudson owned in the Bronx. When Victim-2 moved into the apartment, it was empty except for a stovetop pot, baking soda, and what appeared to Victim-2 to be a sifter. Victim-2 was not certain but believed that these items were drug paraphernalia. Second, during the same period, Victim-2 overheard a phone conversation during which Hudson discussed, in substance, that Hudson was about to receive a new delivery, which would need to be chopped up. Victim-2 believed Hudson's conversation was about drugs.

Government Sur Reply at 9-10.

The Court is satisfied that the Government's theory of the extortion case cannot be presented in the absence of CW-1's testimony about Hudson's epic drug dealing. The decades-long relationship between Hudson and CW-1—a relationship forged in the illegal narcotics distribution trade—is inextricably intertwined with Hudson's involvement in the loansharking-extortion schemes. CW-1's expected testimony shows why Hudson trusted CW-1 with information about his criminal activities, exposed CW-1 to the tens of thousands of dollars in cash that Hudson made dealing drugs, and possessed firearms in CW-1's presence. Moreover, it was within the same time period that CW-1 worked for Hudson's drug business that Hudson involved CW-1 in his loansharking and extortion of Victim-1. Thus, the nature of CW-1's relationship with Hudson explains to the jury why Hudson would trust CW-1 to participate in Hudson's extortion

11

scheme.

CW-1 will also corroborate Victim-2's account that Hudson regularly carried a gun, which was a factor in making Victim-2 believe that Hudson would harm Victim-2 if Victim-2 failed to pay Hudson.

As for Victim-2's observations of Hudson's drug dealing and gun toting, that testimony is admissible as direct evidence of Victim-2's belief (his state of mind at the time of the alleged extortion) that Hudson would follow through on his threats of violence. In extortion cases brought under the Hobbs Act, 18 U.S.C. § 1951, the Government is required to prove "that property was taken from the victim "by the wrongful use of actual or threatened force, violence, or *fear*." 18 U.S.C. § 1951(b)(2) (defining "extortion") (emphasis added). Hence, to satisfy its burden of proof, the Government is permitted to present evidence about the extortion victim's state of mind. *See* Leonard B. Sand et al., Modern Federal Jury Instructions, Comment to Instrs. 50-6 and 50-13 ("The victim's state of mind is of paramount importance in assessing fear. It is well settled that a victim's testimony is admissible on this point.").

The motion for severance is denied.

<u>Government Remaining Still Relevant *In Limine* Motions</u>

I.     EVIDENCE OF HUDSON'S CONVICTIONS FOR DRUG AND WEAPONS OFFENSES IS ADMISSIBLE PURSUANT TO RULE 404(b) IF HUDSON PUTS KNOWLEDGE OR INTENT AT ISSUE

The Government asks that, if Hudson argues at trial that he has no knowledge of or involvement with drugs or weapons, it be allowed to introduce evidence, about his prior convictions for drug and weapons crimes, as proof of his "opportunity, intent, . . . knowledge, . . . absence of mistake, or absence of accident" in committing the charged offenses, pursuant to Federal Rule of Evidence 404(b).

The motion is granted.

II. THE GOVERNMENT ASKS THAT IT BE PERMITTED TO CROSS-EXAMINE THE DEFENDANT REGARDING CERTAIN TOPICS SHOULD HE ELECT TO TESTIFY

The Government asks that, in the event defendant testifies, the Government be allowed to cross-examine defendant about (1) his drug dealing in East Harlem in the 1980s and 1990s, and (2) his past convictions for firearms and controlled substances.

The Government also asks that, if defendant portrays himself on the stand as a law-abiding citizen, or someone who has never been involved with drugs, guns, or violence, that it be permitted to cross-examine Hudson about his 1993 convictions for burglary and attempted robbery, and his 2010 conviction for sale of untaxed cigarettes, and that he was on parole during part of the charged narcotics conspiracy.

The motion is granted.

III. EVIDENCE OF PRIOR STATEMENTS OF VICTIM-2 IS ADMISSIBLE IF HUDSON ASSERTS RECENT FABRICATION OR IMPROPER MOTIVE

The Government asks that, if Hudson claims that Victim-2's testimony has been recently fabricated or that Victim-2 had a motive to lie, it be permitted to elicit testimony from Victim-2 (or from a police officer) about a complaint Victim-2 made to the New York City Police Department ("NYPD") on or about April 25, 2019, concerning threats of harm Hudson had made to Victim-2.

According to the Government, Victim-2 told detectives from the NYPD that Victim-2 had entered into a business arrangement with Hudson to borrow $65,000, which Victim-2 agreed to repay with interest. Victim-2 stated that after Victim-2 had repaid Hudson in full, Hudson began calling Victim-2 "nonstop" and "threatening to harm" Victim-2 in an attempt to get more money from Victim-2. Certain of those threats included Hudson stating to Victim-2 that "I will shoot you twice in the head." Victim-2 told the detectives that Victim-2 was "extremely fearful"

of Hudson "due to his violent criminal past" and that Hudson had threatened Victim-2 in the past with a firearm. Victim-2 also told the detectives that he did not want Hudson arrested or prosecuted, but wanted to make sure the incident was documented.

The motion is granted. Should defendant claim, as the Government suggests, that Victim-2 has recently fabricated that Hudson extorted Victim-2 in order to evade repaying a business debt that Victim-2 owed the defendant, the Government will be permitted to introduce Victim-2's prior consistent statement. *See Tome v. United States*, 513 U.S. 150, 159 (1995) (holding that the Rule 801(d)(1)(B)(i)(ii) "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive" where "those statements were made before the charged recent fabrication or improper influence or motive").

This constitutes the decision and order of the Court.

As the parties requested, the Court has requested a trial date for the fourth quarter of 2021.[3]

Dated: March 4, 2021

_____
Chief Judge

BY ECF TO ALL COUNSEL

---

[3] To ensure the safety of all persons entering the SDNY courthouses during the COVID-19 pandemic, the Court has established best practices for limiting the transmission of COVID-19, including, among other measures, mandatory double masking and enforced social distancing. Select courtrooms have been reconfigured to allow for social distancing during jury trials. Because there are a limited number of courtrooms that have been reconfigured to accommodate jury trials, and because only one jury can be selected each day consistent with health and safety regulations applicable during the pandemic, the Board of Judges has established a procedure for deciding the order in which trial-ready cases will be heard and in what courtrooms those trials will be held. Since defendant has been released on bail conditions and currently at liberty in the community, and therefore falls near the bottom of the priority list for criminal trials, the Court believes it prudent to request a date in the fall, when it is more likely this case will be given a date certain for trial.